864 So.2d 1163 (2003)
LEISURE RESORTS, INC., a Delaware corporation, Appellant,
v.
The CITY OF WEST PALM BEACH, a Florida municipal corporation, Board of Trustees of the Internal Improvement Trust Fund and State of Florida Department of Environmental Protection, Appellees.
No. 4D02-4222.
District Court of Appeal of Florida, Fourth District.
December 31, 2003.
Rehearing Denied February 23, 2004.
*1164 Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, for appellant.
Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, and Brian B. Joslyn and John R. Young of Boose, Casey, Ciklin, Lubitz, Martens, McBane & O'Connell, West Palm Beach, for appellee The City of West Palm Beach.
GUNTHER, J.
Leisure Resorts, Inc. appeals a directed verdict awarded to the City of West Palm Beach on the issues of causation and damages arising in a breach of lease and quiet title action. We affirm.
In 1968, the City entered into a 99-year lease with West Palm Beach Marina, Inc. for the 19.5-acre Palm Harbor Marina. Of those 19.5 acres, fourteen acres were submerged property and 5.5 acres were waterfront property referred to as the "uplands." The uplands was the site of condos, parking, and recreational facilities, and the submerged property was the site of a marina including 160 boat spaces and a fuel station. In 1979, the City entered into a Consolidated and Amended Lease with West Palm Beach Marina, which was subsequently assigned to Leisure.
Upon taking control of the leasehold premises, Leisure did secure the City Commission's unanimous approval of its plan for renovating the existing docks and boating facilities. After Leisure made the renovations, beginning in the late 1980s, Leisure determined that further repair was no longer a prudent investment, and that replacement of the marina was required due to the effects of aging and the advent of "mega yachts." Leisure then developed a plan to alter the marina from four to five docks, create larger boat spaces (the exact number of boat spaces being uncertain), move the fuel station, make technological improvements, and expand the marina onto an additional eight acres of state-owned submerged property. Leisure has never sought unanimous City Commission approval of this plan, contending that none is required.
While Leisure was planning and obtaining permits, a title dispute as to the submerged portion of the leasehold premises emerged. This Court concluded, and the *1165 Florida Supreme Court agreed, that the state owned the majority of the submerged property, and that the city owned only the footprints of the docks. See City of W. Palm Beach v. Bd. of Trs. of the Internal Improvement Trust Fund, 714 So.2d 1060 (Fla. 4th DCA 1998), approved by, 746 So.2d 1085 (Fla.1999). Ultimately, based on this Florida Supreme Court decision, the trial court granted a partial summary judgment for breach of lease against the City because the City did not own the submerged land leased to Leisure, except for the footprints of the docks.
Concerning the remaining issues of the breach of contract claim, Leisure and the City disagree as to whether Leisure's expansion project required unanimous City Commission approval.
The City argues that because Leisure failed to obtain the necessary unanimous city commission approval of its expansion plan, it is Leisure that breached the contract in dispute. At the heart of this dispute are two provisions of the Consolidated and Amended Lease.
The City relies on Article XXX, Section 5 of the lease to assert the necessity of unanimous City Commission approval:
Lessee agrees that it will use good site planning and architectural design so that the buildings will fit into the character of the downtown area of West Palm Beach or enhance the same, and retain the waterfront characteristics of the area. There are presently 1,573.35 feet of waterfront view, measured on a north-south line, presently existing, of which Lessee agrees to retain open and free from building obstructions as viewed from Flagler Drive sixty-two and 82/100 (62.82%) percent. All development of the Leasehold Premises herein shall be pursuant to a site plan to be approved by resolution or motion of the City Commission unanimously passed, and any modification, change or amendment thereto shall require a unanimous vote of approval of same by City Commission of the City of West Palm Beach.
On the other hand, Leisure relies on Article XIX, Section 4 to support its belief that unanimous City Commission approval is not required to alter the location, size, and configuration of the boat spaces in order to expand the marina:
It is understood and agreed that Leisure will maintain eighty (80%) percent of the one hundred sixty (160) boat spaces that are presently available, unless it can show a need to reduce the same. Lessor, however, shall have the right and sole discretion to deny the reduction in said request. However, Lessee shall have the right to change locations of said spaces, size of spaces and general configuration, and that during certain periods of construction reduce the number of boat spaces available, there being presently one hundred (160) dock spaces available.
At trial, Leisure presented evidence on causation and damages, and the City sought a directed verdict on the issues. The trial court granted a directed verdict to the City precluding damages because of the lack of a binding expansion agreement between Leisure and the City. The trial court interpreted Article XXX, Section 5 to "clearly and unambiguously require[ ] the plaintiff, as a condition precedent of any reconfiguration or expansion of the marina, [to] present a site plan to the City Commission and obtain unanimous approval from the Commission." The trial court also ruled that expansion was not contemplated at the time the Amended and Consolidated Lease was executed, and thus, damages were not legally foreseeable. Presumably as a result of this conclusion, the trial court did not interpret Article XIX, Section 4.
*1166 The standard of review applicable to contract interpretation is de novo. Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 876 n. 2 (Fla. 4th DCA 2002) (citing DEC Elec., Inc. v. Raphael Constr. Corp., 558 So.2d 427, 428 (Fla. 1990)). In undertaking review of a lease, the appellate court is permitted to reassess the contract and reach a different interpretation from that of the trial court. Sugar Cane Growers Coop. of Fla. v. Pinnock, 735 So.2d 530, 534 (Fla. 4th DCA 1999). The contract should be reviewed as a whole and all language given effect, and where the language is clear and unambiguous, the contract should be enforced as it reads. Id. If ambiguous, the words of the contract should be given their plain and ordinary meaning. Beans v. Chohonis, 740 So.2d 65, 67 (Fla. 3d DCA 1999) (citing Rupp Hotel Operating Co. v. Donn, 158 Fla. 541, 29 So.2d 441 (1947)).
We first consider Article XXX, Section 5 and conclude that the trial court erred in ruling that the provision requires unanimous City Commission approval of any expansion of the docks and facilities. For three reasons, we conclude that the provision applies only to the modification of development plans regarding the uplands, and not the submerged area of the leasehold premises. First, the provision, by its plain language, refers to buildings, architecture, and the waterfront, indicating that the provision was intended to address only the development of the uplands. Second, the approval portion of the provision addresses only the "Leasehold Premises herein." That phrase was not used anywhere else in the lease, and therefore the inclusion of that phrase must be deemed purposeful and given the effect of indicating that the approval requirement applies only to the portion of the leasehold premises discussed in the provision, that being the uplands. Third, this interpretation is bolstered by the fact that within the very same article of the lease, Article XXX, Section 3 includes the phrase "entire Leasehold Premises," to designate both the uplands and submerged lands. This indicates that the contract drafter knew how to refer to the full leasehold premises as defined in the contract to include both the uplands and submerged lands. See Int'l Fidelity Ins. Co. v. County of Rockland, 98 F.Supp.2d 400, 412 (S.D.N.Y.2000) ("[S]ophisticated lawyers ... must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so.").
We now turn to Article XIX, Section 4. The plain language of this provision allows Leisure to change the spaces, size of spaces, and general configuration of the marina, so long as Leisure retains at least 128 boat spaces (80% of 160). However, we conclude that this provision cannot be read so broadly as to encompass Leisure's expansion plan. While there is no provision in the Amended and Consolidated Lease preventing the expansion of the marina onto submerged land adjacent to the leasehold premises, this fact does not alter the meaning of Article XIX, Section 4. A drastic overhaul of the existing marina, by moving piers, altering docks, relocating boat spaces, changing the number of boat spaces, and repositioning the fuel station is not contemplated by the provision. Undertaking a massive renovation is not as simple as changing the general configuration of the marina. This is especially the case where Leisure has failed to establish that it has complied with Article XIX, Section 4 by providing a plan including not less than 80% of the 160 original boat spaces. The percentage requirement of Article XIX, Section 4 remains of importance even though the City owns only the submerged lands constituting the footprints *1167 of the docks. That submerged land remains subject to the lease and under the control of the City because it would necessarily be used in some way or form for the newly designed marina.
In sum, we disagree with the trial court's interpretation that Article XXX, Section 5 was applicable to the proposed expansion plan, and thus, required unanimous City Commission approval. However, we do agree with the City's contention that Article XIX, Section 4 does not permit Leisure's project without a clear declaration of the exact number of boat spaces to remain on the leasehold premises (no fewer than 80% of the 160 boat spaces). We also agree with the trial court's ruling that expansion was not contemplated by the parties. Therefore, because one obstacle only gives way to another for Leisure, we conclude that the trial court did not err in granting a directed verdict to the City and affirm.
AFFIRMED.
FARMER, C.J., and KRATHEN, DAVID H., Associate Judge, concur.